**Certiorari Granted, September 20, 2013, No. 34,287**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-094**

**Filing Date: July 23, 2013**

**Docket No. 31,297**

**HAMAATSA, INC., a New Mexico**
**not-for-profit corporation,**

       **Plaintiff-Appellee,**

**v.**

**PUEBLO OF SAN FELIPE,**
**a federally recognized Indian tribe,**

       **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**George P. Eichwald, District Judge**

The Simons Firm, LLP
Thomas A. Simons, IV
Faith Kalman Reyes
Santa Fe, NM

for Appellee

Samuel D. Gollis, Attorney at Law, P.C.
Samuel D. Gollis
Gwenellen P. Janov, Of Counsel
Albuquerque, NM

for Appellant

## OPINION

**SUTIN, Judge.**

**{1}**     Hamaatsa, Inc. filed an action against the Pueblo of San Felipe seeking a declaration

1

that a road, which crossed Pueblo property that was acquired in fee simple, was a state public road.  In an interlocutory appeal, the Pueblo contends that the district court erred in denying the Pueblo's motion to dismiss for lack of subject matter jurisdiction based on sovereign immunity.  We affirm.

## BACKGROUND

### The Complaint

**{2}**    Hamaatsa's complaint requests the district court to declare Northern R.S. 2477 (the road) a state public road.  Further, as a member of the public and the owner of property contiguous to the road, Hamaatsa requests that the court declare that the Pueblo cannot restrict its use of the road.  The complaint was filed in response to the Pueblo's notice to Hamaatsa threatening to restrict Hamaatsa's use of the road.

**{3}**    The complaint alleges that the road was owned by the Bureau of Land Management (the BLM) since at least 1906, was constructed and used by the public from at least 1935 up to and including the date of the complaint, and was used by Hamaatsa and its predecessors in interest to access their property.  The complaint further alleges that under 43 U.S.C. § 932 (1866), Rev. Stat. § 2477, the road has been a public road since at least 1906 or 1935, and because it was not retained by the United States, the road became vested in the public as a state highway, and it remains a public state highway because it has not been vacated.  Although § 932 was repealed, the road was constructed before the repeal in 1976, the repeal expressly preserved the road, and the road remained a state highway pursuant to NMSA 1978, Section 67-2-1 (1905).  The property through which the road runs was conveyed to the Pueblo in December 2001 by the BLM in fee simple.  In that conveyance, the BLM reserved an easement along the road "for the full use as a road by the United States for public purposes."  By quitclaim deed, the BLM purported, in September 2002, to quitclaim its interest in the road to the Pueblo.

### The Motion to Dismiss

**{4}**    The Pueblo moved, pursuant to Rule 1-012(B)(1) NMRA, to dismiss Hamaatsa's complaint for lack of subject matter jurisdiction based on the doctrine of tribal sovereign immunity.  At a district court hearing on the Pueblo's motion to dismiss, much of the argument involved the question whether the action was in personam or in rem.

**{5}**    The Pueblo argued that the action was for injunctive relief, affecting and altering the Pueblo's interest in the fee simple parcel it had acquired, and that the action was therefore in personam.  The Pueblo also argued that Hamaatsa's action was in essence a quiet title action that would "materially. . . affect the ownership interest of the Pueblo in its property" and that "[t]o declare that the road, in fact, exists fundamentally alters the Pueblo's property interest, ownership interest, in this property."

2

**{6}** Hamaatsa responded that its action was for non-monetary declaratory relief and that it was not seeking an injunction. Hamaatsa's counsel stated, "We have simply sought a declaration that this is a public road." Hamaatsa presented argument and authority to support its view that the action was not, as the Pueblo had asserted, a quiet title action, but was an action purely in rem, arguing that "[t]his case is all about in rem jurisdiction."

**{7}** The court ruled simply that the action was in rem, and the court denied the Pueblo's motion to dismiss. Additionally, the court granted leave for an interlocutory appeal.

**The Interlocutory Appeal**

**{8}** This case comes to this Court through interlocutory appeal based on the district court's denial of the Pueblo's Rule 1-012(B)(1) motion to dismiss for lack of subject matter jurisdiction. Our review is de novo. *Lu v. Educ. Trust Bd. of N.M.*, 2013-NMCA-010, ¶ 7, 293 P.3d 186.

**{9}** As conceded by the Pueblo in its argument to the district court and in its brief in chief on appeal, the Pueblo's purely facial challenge to jurisdiction compels us to accept as true all material allegations of the complaint and also to construe the complaint in favor of the complaining party. *Forest Guardians v. Powell*, 2001-NMCA-028, ¶ 5, 130 N.M. 368, 24 P.3d 803; *see Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995) (stating that when analyzing a facial attack under Federal Rule of Civil Procedure 12(b)(1), the court "must accept the allegations in the complaint as true"); *Genberg v. Porter*, ___ F. Supp. 2d ___, Civ. A. No. 11-cv-02434-WYD-MEH, 2013 WL 1222056, at *6 (D. Colo. March 25, 2013) (same); *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 791, 793 (N.D. Ohio 2011) (indicating that allegations that may seem conclusory in nature but are supported by factual allegations are not to be denied the presumption of truth but instead may be examined by the court "to gauge whether the remaining allegations, accepted as true, plausibly give rise to entitlement to relief" (internal quotation marks and citation omitted)). The Pueblo nowhere argues that any particular allegation in the complaint is unworthy of being accepted as true for the purposes of the motion to dismiss. Accordingly, as this case comes to us, Hamaatsa's action is to declare the road, alleged and conceded for the purposes of the motion to be a state public road, to be a state public road.[1]

---

[1] The state or county has exclusive regulatory authority and jurisdiction over its roads. N.M. Const. art. V, § 14 (creating the state transportation commission); § 67-2-1 ("All roads and highways, except private roads, established in pursuance of any law of New Mexico, and roads dedicated to public use, that have not been vacated or abandoned, and such other roads as are recognized and maintained by the corporate authorities of any county in New Mexico, are hereby declared to be public highways."); NMSA 1978, § 67-3-11 (2003) (authorizing the state transportation commission "to make all rules and regulations as may be necessary to carry out the provisions of" the Highway Department Organization Act, NMSA 1978, §§ 67-1-1 to -3 (1977)); NMSA 1978, § 67-3-12 (2006) (describing the

3

**{10}** We review the district court's denial of the Pueblo's motion to dismiss as the case has come to us, but we decide it on grounds different from those relied upon by the district court. *See Meiboom v. Watson*, 2000-NMSC-004, ¶ 20, 128 N.M. 536, 994 P.2d 1154 (indicating that the appellate courts may affirm a district court's ruling on a ground different from that relied on by the district court). We see no reason to address the issue of in rem versus in personam, or, if the action is in rem, whether the Pueblo can nevertheless seek dismissal for lack of subject matter jurisdiction based on sovereign immunity.[2] By choosing to make its attack on Hamaatsa's complaint a purely facial one, thereby conceding the truth of the allegations in the complaint, the Pueblo admitted the existence of a state public road. As we indicate later in the body of this Opinion, there is no basis for a sovereign immunity defense at this stage of the proceeding where it is presumed that the road in question is a state public road.

**DISCUSSION**

**{11}** Notwithstanding its purely facial attack and admission of the truth of the allegations of the complaint, including that the road is a state public road, the Pueblo argues that sovereign immunity bars the action for lack of subject matter jurisdiction. Yet, the Pueblo offered no evidence of any property or governance interests whatsoever in the road or that the road, concededly a state public road, would threaten or otherwise affect its sovereignty. The Pueblo has not attempted any proof, for example, that even though the road is a state public road, a district court's declaration of that fact would in any way undermine the Pueblo's sovereignty or sovereign authority, infringe on any right of the Pueblo to govern itself or control its internal relations, or otherwise adversely affect its governmental, property, or treasury interests.[3]

---

powers and duties of the state transportation commission); *Jicarilla Apache Tribe v. Bd. of Cnty. Comm'rs*, 1994-NMSC-104, ¶ 21, 118 N.M. 550, 883 P.2d 136 (explaining that state courts have exclusive jurisdiction over matters relating to public roads).

[2] If the attack is facial only, and if the facts alleged show that in personam jurisdiction is involved, it seems clear that, facially, the tribe should likely be dismissed. If the attack is factual, and if the facts show that in personam jurisdiction is involved, it seems clear that factually, the tribe should likely be dismissed. If the attack is facial only, and if the facts alleged show that in rem jurisdiction is involved, the court would then be required to resolve whether the tribe should nevertheless be dismissed pursuant to its sovereign immunity. The same holds if the attack is factual and the facts show that in rem jurisdiction is involved. If persuasive law holds that even if the facts alleged or proved show that the action is in rem, the tribe still has sovereign immunity, it would appear that there is no reason to ever get into the question whether the action is in rem, since whether it is in rem or not in rem would be irrelevant.

[3] Hamaatsa argued in the district court that it filed the action upon being threatened with blockage because the Pueblo was in the process of attempting to have its fee simple

4

**{12}** To our knowledge, no United States Supreme Court case or body of federal law, and no New Mexico case, is clearly determinative or constitutes binding precedent favoring the Pueblo under the particular circumstances here. This Court has considerable difficulty, at this Rule 1-012(B)(1) stage, construing the law to require dismissal for lack of subject matter jurisdiction based on sovereign immunity. In our view, the Pueblo's invocation of sovereign immunity in a facial challenge at this stage of the proceedings is not supported by law.

**{13}** "Tribal sovereign immunity is 'a necessary corollary to Indian sovereignty and self-governance[.]' " *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 928 (7th Cir. 2008) (quoting *Three Affiliated Tribes of Ft. Berthold Res. v. Wold Eng'g, P.C.*, 476 U.S. 877, 894 (1986)). If common law sovereign immunity from suit is an attribute of sovereignty, one must wonder why immunity should exist in this case where the Pueblo has shown no other attribute of sovereignty—such as a property, treasury, or governance interest in or sovereign authority over the road—that could bestow immunity from inherent sovereignty. In this case, with no evidence showing that a significant aspect of the Pueblo's inherent sovereignty or sovereign authority is adversely affected, we see no justifiable basis on which the Pueblo can draw immunity from inherent sovereignty.

**{14}** In our view, the issue in this case is a matter of state law, over which the district court has jurisdiction. *See Jicarilla Apache Tribe*, 1994-NMSC-104, ¶¶ 10-19 (stating that "[w]hether an easement—a public road at that—exists across land held in fee simple is clearly an issue of state law" and holding that Public Law 280 did not preempt "state[]court jurisdiction to adjudicate a preexisting interest in land that is purchased by an Indian tribe and then held by the tribe in fee simple"). We note that the United States Supreme Court supports the view that an Indian tribe cannot exercise jurisdiction over conduct on a public roadway. *See Montana v. United States*, 450 U.S. 544, 566 (1981) (making clear that a tribe cannot regulate the conduct of persons on land it does not own when there is no direct effect on the political or economic security of the tribe); *see also Nevada v. Hicks*, 533 U.S. 353, 359 (2001) ("Where nonmembers are concerned, the 'exercise of tribal power *beyond what is necessary to protect tribal self-government or to control internal relations* is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.' " (quoting *Montana*, 450 U.S. at 564)); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 647 (2001) (holding, based on *Montana*, that "Indian tribes lack civil authority over . . . tribal attempts to tax nonmember activity occurring on non-Indian fee land"); *Strate v. A-1 Contractors*, 520 U.S. 438, 442, 459 (1997) (holding that a tribe cannot exercise jurisdiction and does not have adjudicatory authority over conduct on a public highway that runs through its reservation); *South Dakota v. Bourland*, 508 U.S. 679, 694-95, 697 (1993)

---

parcel placed in trust. We proceed with the understanding that, as the Southwest Director of the Bureau of Indian Affairs (BIA) concluded, favorably to Hamaatsa, the BIA would not take the fee simple parcel in trust until the present dispute over the road is resolved. *See Hamaatsa, Inc. v. Sw. Reg'l Dir.*, 55 IBIA 132, 132-33 (2012) (order vacating decisions and dismissing appeal).

(explaining that a tribe did not have authority to regulate non-Indian hunting and fishing on land that was located within the reservation, but was owned by the United States); *Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*, 492 U.S. 408, 430 (1989) (stating, in the context of a zoning dispute, that "[t]he governing principle is that the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land").

**{15}**    The legal and practical effect of permitting the Pueblo to assert sovereign immunity in its facial challenge and at this stage of the proceedings would be to permit the Pueblo to assert control over a state public road, yet to deprive Hamaatsa, or any other member of the public, any opportunity for legal recourse. As noted in *Jicarilla Apache Tribe*, we must be mindful of the practical effects of the application of sovereign immunity as an unfettered bar to claims that patently do not infringe on tribal sovereignty. *See* 1994-NMSC-104, ¶ 21 (explaining that "[b]ecause it would concern a matter of state law, a complaint involving a disputed easement across a tract of land . . . would not be entertained in federal district court[,]" and the practical effect of depriving state courts of jurisdiction over such matters is the "anomalous result" of denying tribal and non-tribal parties a judicial forum in which to settle their respective property rights). *Jicarilla Apache Tribe* supports the conclusion, at least in this stage of the proceedings, that the issue regarding the road is one of state law over which the district court has jurisdiction.

**{16}**    Further, to permit a sovereign immunity bar at this facial attack stage of the proceedings would mean that, based on nothing more than the bare assertion of sovereignty, a pueblo or tribe could acquire, in fee simple, subject to an existing state public road, one or more lot or acreage virtually anywhere in New Mexico and immediately deny the motoring public and all neighboring property owners access. And it means that no person whose property is, and perhaps has been for generations, contiguous to a public road before a fee simple acquisition of property through which the road runs, could invoke state court jurisdiction to at least obtain a judicial declaration, binding on a pueblo or tribe, that a road is a state public road. In our view, the Pueblo cannot have such carte blanche immunity on a Rule 1-012(B)(1) facial attack when it acquires property in fee simple subject to a state public road as it did here.

**{17}**    "Suits against Indian tribes . . . remain a highly contentious issue." Carole E. Goldberg, Rebecca Tsosie, Kevin K. Washburn & Elizabeth Rodke Washburn, *American Indian Law: Native Nations and The Federal System* 443 (6th ed. 2010). The circumstances here lend credence to Justice Stevens' words in his concurring opinion in *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma (Potawatomi)*, 498 U.S. 505, 514 (1991) (Stevens, J., concurring).[4]  He stated:

---

[4]  While there exists no "unequivocal expression" in the present case manifesting an intent to relinquish tribal immunity, *see Potawatomi*, 498 U.S. at 509 (stating that to relinquish its immunity, a tribe's waiver must be "clear"), one would nevertheless reasonably

The doctrine of sovereign immunity is founded upon an anachronistic fiction. In my opinion all Governments—federal, state, and tribal—should generally be accountable for their illegal conduct. . . . Nevertheless, I am not sure that the rule of tribal sovereign immunity extends to cases arising from a tribe's conduct of commercial activity outside its own territory[.]

*Id.* at 514-15 (Stevens, J., concurring) (citations omitted). Justice Stevens then correctly points out that the majority opinion in *Potawatomi* "in effect acknowledges limits to a tribe's sovereign immunity, although it does not do so explicitly." *Id.* at 515 (Stevens, J., concurring). Justice Stevens states:

My purpose in writing separately is to emphasize that the Court's holding in effect rejects the argument that this governmental entity—the [t]ribe—is completely immune from legal process. By addressing the substance of the tax commission's claim for prospective injunctive relief against the [t]ribe, the Court today recognizes that a tribe's sovereign immunity from actions seeking money damages does not necessarily extend to actions seeking equitable relief.

*Id.* at 515-16 (Stevens, J., concurring).

**{18}** The majority in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751 (1998), discussed *Potawatomi* and in language also pertinent to the case now before this Court, stated:

The doctrine of tribal immunity came under attack a few years ago in *Potawatomi* . . . . The petitioner there asked us to abandon or at least narrow the doctrine because tribal businesses had become far removed from tribal self-governance and internal affairs. We retained the doctrine, however, on the theory that Congress had failed to abrogate it in order to promote economic development and tribal self-sufficiency. The rationale, it must be said, can be challenged as inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities. Justice [Stevens], in a separate opinion, criticized tribal immunity as founded upon an anachronistic fiction and suggested it might not extend to off-reservation commercial activity.

---

inquire whether a tribe that obtains a property beyond reservation boundaries in fee simple, knowing that the property is subject to a state public road, should be held at least at the Rule 1-012(B)(1) facial attack stage to have knowingly relinquished immunity if sued for threatening to block or blocking public access, particularly when the access being blocked or threatened has not been shown to adversely affect significant tribal governance or other aspects of inherent tribal sovereignty.

. . . In our interdependent and mobile society . . . tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.

*Kiowa Tribe*, 523 U.S. at 757-58 (internal quotation marks and citations omitted).

**{19}** In spite of its misgivings, the Court in *Kiowa Tribe* invoked sovereign immunity. *Id.* at 753, 760. Keeping with his view of sovereign immunity, Justice Stevens, in his dissent in *Kiowa Tribe*, with Justices Thomas and Ginsburg joining, stated:

Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the [s]tate. There is no federal statute or treaty that provides petitioner . . . any immunity from the application of Oklahoma law to its off-reservation commercial activities. Nor, in my opinion, should this Court extend the judge-made doctrine of sovereign immunity to pre-empt the authority of the state courts to decide for themselves whether to accord such immunity to Indian tribes as a matter of comity.

. . . .

In sum, we have treated the doctrine of sovereign immunity from judicial jurisdiction as settled law, but in none of our cases have we applied the doctrine to purely off-reservation conduct. Despite the broad language used in prior cases, it is quite wrong for the Court to suggest that it is merely following precedent, for we have simply never considered whether a tribe is immune from a suit that has no meaningful nexus to the tribe's land or its sovereign functions. Moreover, none of our opinions has attempted to set forth any reasoned explanation for a distinction between the [s]tates' power to regulate the off-reservation conduct of Indian tribes and the [s]tates' power to adjudicate disputes arising out of such off-reservation conduct. Accordingly, while I agree with the Court that it is now too late to repudiate the doctrine entirely, for the following reasons[,] I would not extend the doctrine beyond its present contours.

*Id.* at 760, 764 (internal quotation marks and citations omitted). The majority's concerns and Justice Stevens' dissent in *Kiowa Tribe*, read fully, should stimulate analysts to reasonably view the case now before this Court as one beyond the periphery of immunity, requiring affirmance of the district court's denial of the Pueblo's motion to dismiss.

**{20}** This is not a case in which a party suing a tribe has engaged in a contractual or commercial relationship with that tribe. No one is forced to enter into such relationships. Those entering into such relationships do so voluntarily, by choice, and they should know the legal risks. When a tribe acquires property in fee simple that envelops a state public road and subsequently denies access to existing property owners or other individuals, those excluded are innocent citizens who had no choice and cannot be held to have known or anticipated a legal risk of access denial and a dispositive facial assertion of sovereign immunity by an Indian tribe.

**{21}** In sum, the allegations of the complaint survive the Rule 1-012(B)(1) facial attack. The allegations in the complaint were presumed to be true for the purposes of the motion, and the Pueblo has not shown any factual, legal, or rational basis on which to invoke sovereign immunity in the face of those allegations—including the allegation, undisputed and fully supported by other allegations, that the road is a state public road.

## CONCLUSION

**{22}** We affirm the district court's denial of the Pueblo's motion to dismiss under Rule 1-012(B)(1), and we remand for further proceedings.

**{23}** **IT IS SO ORDERED.**

 

                                     _____

                                     **JONATHAN B. SUTIN, Judge**

**I CONCUR:**

_____

**J. MILES HANISEE, Judge**

**JAMES J. WECHSLER, Judge, dissenting.**

**WECHSLER, Judge (dissenting).**

**{24}** Regardless of the stage of a proceeding, the doctrine of tribal sovereign immunity applies to insulate Indian tribes from being required to defend actions in state court. I therefore believe that this Court must analyze the issues presented to the district court. When I conduct that analysis, I conclude that the Pueblo's motion to dismiss should have been granted. I thus respectfully dissent.

## TRIBAL SOVEREIGN IMMUNITY

**{25}** My concerns with the Majority Opinion focus on its discussion of (1) *Kiowa Tribe*, 523 U.S. 751, (2) cases that do not involve tribal sovereign immunity, (3) the equities of this

case, and (4) the timing of the Pueblo's motion. I discuss each below.

**{26}** As to my first concern, the doctrine of tribal sovereign immunity is a matter of federal law and is not subject to diminution by the state. *Armijo v. Pueblo of Laguna*, 2011-NMCA-006, ¶ 10, 149 N.M. 234, 247 P.3d 1119. The doctrine recognizes that "Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories. Indeed, Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Id.* (internal quotation marks and citation omitted). Sovereign immunity not only embraces the long-recognized principle that a tribe is immune from suit, but it likewise protects a tribe from being hauled into court. *Cf. Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) (stating, in the context of state sovereign immunity, that sovereign immunity "does not exist solely in order to prevent federal-court judgments that must be paid out of a [s]tate's treasury[;] it also serves to avoid the indignity of subjecting a [s]tate to the coercive process of judicial tribunals at the instance of private parties[.]" (alteration, internal quotation marks, and citations omitted); *United States v. James*, 980 F.2d 1314, 1319 (9th Cir. 1992) (holding that tribal sovereign immunity barred a subpoena directing the tribe's director of social services to produce records based on the rationale that tribal sovereign immunity encompasses immunity from the "processes of the court").

**{27}** As the Majority Opinion states, there are issues concerning the scope of tribal sovereign immunity when tribes or pueblos engage in activities that extend beyond the original purpose of the doctrine to safeguard tribal self-governance. *See Kiowa Tribe*, 523 U.S. at 757-58 (stating that the rationale supporting the tribal immunity doctrine "can be challenged as inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities"). *Kiowa Tribe* involved a commercial transaction in which the Kiowa Tribe executed and delivered a promissory note beyond its tribal lands to make payments also beyond its tribal lands. *Id.* at 753-54. After the tribe defaulted, the payee sued the tribe in state court. *Id.* at 754. Despite the *Kiowa Tribe* Court's expressing "reasons to doubt the wisdom of perpetuating the doctrine" of tribal sovereign immunity beyond the degree "needed to safeguard tribal self-governance[,]" and notwithstanding the different outcome suggested by Justice Stevens' dissent, the Court stated that "the doctrine of tribal immunity is settled law and controls in this case" and deferred to Congress to make any changes to the doctrine. *Id.* at 756-60. It reversed the decision of the Oklahoma Court of Civil Appeals that declined to recognize immunity. *Id.* at 760. The Court specifically held, as has our New Mexico Supreme Court, that there are only two exceptions to tribal sovereign immunity: (1) Congress can expressly authorize suits against Indian tribes, and (2) a tribe can waive its sovereign immunity. *Id.* at 754; *Gallegos v. Pueblo of Tesuque*, 2002-NMSC-012, ¶ 7, 132 N.M. 207, 46 P.3d 668. The Majority Opinion relies on the dissent and the majority's concerns in *Kiowa Tribe*, as well as the concurring opinion in *Potawatomi*, 498 U.S. at 514-15, in which Justice Stevens expressed similar concerns about applying tribal sovereign immunity to tribal commercial activity "outside its own territory." I too recognize that the Pueblo's assertion of tribal sovereign immunity in this case appears to extend the doctrine beyond its original purpose of safeguarding tribal self-governance or

10

the protection of reservation land or land held in trust by the United States. *See Kiowa Tribe*, 523 U.S. at 758. Yet, if the Supreme Court in *Kiowa Tribe*, despite its concerns, followed the doctrine, deferring to Congress to make changes, I do not believe that this Court is in a position to act differently.

{28}    Second, I have difficulty with the Majority Opinion's application of cases that do not involve issues of tribal sovereign immunity to support its holding. It concludes that "the issue in this case is a matter of state law," citing *Jicarilla Apache Tribe*, 118 N.M. at 554-57, 883 P.2d at 140-43. Majority Op. ¶ 14. But, our Supreme Court has expressly stated that "tribal immunity is a matter of federal law." *Gallegos*, 2002-NMSC-012, ¶ 7; *see also Kiowa Tribe*, 523 U.S. at 754-55 (applying federal law to determine the availability of tribal sovereign immunity). Further, *Jicarilla Apache Tribe* is a case of statutory construction, not tribal sovereign immunity. The issue was whether a federal statute, 28 U.S.C. § 1360(b) (1984), preempted state court jurisdiction of an Indian tribe's trespass action in a dispute concerning land purchased by the tribe. *Jicarilla Apache Tribe*, 118 N.M. at 551, 883 P.2d at 137. Our Supreme Court decided against preemption and considered a result that would have precluded the tribe from bringing its trespass action in state court to be an anomalous construction of the statute, supporting its conclusion. *Id.* at 558, 883 P.2d at 144. Because *Jicarilla Apache Tribe* does not address tribal sovereign immunity, it is not relevant to our analysis.

{29}    Similarly, the Majority Opinion cites *Montana* and several other United States Supreme Court cases for the proposition that the Court "supports the view that an Indian tribe cannot exercise jurisdiction over conduct on a public roadway." Majority Op. ¶ 14. However, *Montana* and the cases that follow it also do not involve issues of tribal sovereign immunity. See 450 U.S. at 557 (addressing "the question of the power of the [t]ribe to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the [t]ribe"). Rather, they involve the separate issue of a tribe's sovereign authority over tribal lands. *See Nevada*, 533 U.S. at 374 (relying on *Montana* and *Strate* and concluding that because the tribe lacked sovereign authority over the dispute, it "also lacked adjudicative authority to hear respondent's claim that those officials violated tribal law in the performance of their duties"); *Atkinson Trading*, 532 U.S. at 647 (addressing the sovereign authority of a tribe to tax nonmember activity occurring on non-Indian fee land); *Strate*, 520 U.S. at 442 (addressing "the adjudicatory authority of tribal courts over personal injury actions against defendants who are not tribal members"); *Bourland*, 508 U.S. at 681-82 (addressing "whether the [tribe] may regulate hunting and fishing by non-Indians on lands and overlying waters located within the [t]ribe's reservation but acquired by the United States"); *Brendale*, 492 U.S. at 414 (addressing "whether the [tribe or the state], has the authority to zone fee lands owned by nonmembers of the [t]ribe located within the boundaries of the" reservation). "There is a difference between the right to demand compliance with state laws and the means available to enforce them." *Kiowa Tribe*, 523 U.S. at 755; *see also Armijo*, 2011-NMCA-006, ¶ 18 (stating that cases involving a tribe bringing suit to preclude a municipality from imposing taxes or other local laws "do not explore the boundaries of a tribe's *sovereign immunity* from suit[, and r]ather, they explore a tribe's

11

*sovereign authority* over purchased lands").

**{30}** Third, "sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation[, and,] it presents a pure jurisdictional question." *Armijo*, 2011-NMCA-006, ¶ 13 (internal quotation marks and citation omitted). The Majority Opinion stresses that the effect of permitting the Pueblo to exercise tribal sovereign immunity would be to deprive Hamaatsa and other members of the public the opportunity for legal recourse. Majority Op. ¶ 16. The Majority Opinion even speculates that if tribal sovereign immunity were to apply, a pueblo or tribe could acquire property "virtually anywhere in New Mexico" and deny access to the motoring public and neighboring property owners. *Supra.* This speculation assumes that a property owner has the ability to convey a dedicated public road and extends far beyond the facts of this case. But, more significantly, although I agree that Hamaatsa makes a strong equitable argument, as this Court stated in *Armijo*, it is not relevant to the jurisdictional question before us. *Id.*

**{31}** Lastly, I do not agree with the Majority Opinion that the timing of the Pueblo's motion is relevant to our analysis. Whether under federal or state Rules of Civil Procedure, an assertion that tribal sovereign immunity requires dismissal of a lawsuit "is generally raised in a [R]ule [1-0]12([B])(1) motion[.]" *Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099, 1113 (Colo. 2010); *see id.* (citing cases, including *Kiowa Tribe*, 523 U.S. at 754, in which the issue of tribal sovereign immunity has been raised by such motion). A motion under Rule 1-012(B) "shall be made before pleading if a further pleading is permitted." Thus, the Pueblo's motion was properly before the district court and necessitated a decision.

**{32}** I therefore turn to the merits of the Pueblo's motion to dismiss. The district court denied that motion, reasoning that the complaint presented an in rem proceeding and that tribal sovereign immunity does not apply to in rem proceedings or to actions seeking non-monetary relief. I address these issues below, first considering whether this case presents an issue of in rem or in personam jurisdiction. Concluding that it is in rem, I then address whether tribal sovereign immunity applies to an in rem proceeding in which the subject is property held by an Indian tribe in fee simple. Lastly, I consider whether it applies to a complaint seeking declaratory relief.

**IN REM**

**{33}** The Pueblo argues that the district court erroneously concluded that the complaint presented an in rem proceeding and that it need not exercise in personam jurisdiction over the Pueblo. In the Pueblo's view, Hamaatsa's complaint presents an action for declaratory and injunctive relief in which Hamaatsa seeks to quiet the Pueblo's title to its land, and, therefore, as a quiet title action, it is not an in rem proceeding. Hamaatsa responds by arguing that the complaint does not seek to quiet title to the Pueblo's land, and, even assuming that the complaint presents a quiet title action under our quiet title statute, NMSA 1978, § 42-6-1 (1951), a quiet title action requires only in rem jurisdiction over the property

12

at issue and not in personam jurisdiction over the property owner.

**{34}**     Our Supreme Court has stated that historically and "[m]ost commonly, in rem is defined as a proceeding or action instituted against a thing in contradistinction to in personam actions which are directed against a person." *State v. Nunez*, 2000-NMSC-013, ¶ 78, 129 N.M. 63, 2 P.3d 264 (internal quotation marks and citation omitted).  "However, in modern jurisprudence, this definition is neither conceptually nor practically accurate." *Id.*  In the modern sense, an in rem proceeding is one "[i]nvolving or determining the status of a thing, and therefore the rights of persons generally with respect to that thing." *Black's Law Dictionary* 864 (9th ed. 2009).  A "proceeding[] in rem [is one] which determine[s] interests in specific property as against the whole world." *State ex rel. Hill v. Dist. Court of Eighth Judicial Dist.*, 79 N.M. 33, 34, 439 P.2d 551, 552 (1968).  In other words, "[a]n in rem action is directed, not *against* the property per se, but rather at resolving the interests, claims, titles, and rights in that property[, a]nd it is persons—as individuals, governments, corporations—who possess those interests, claims, titles, and rights." *Nunez*, 2000-NMSC-013, ¶ 78 (footnote omitted).

**{35}**     Applying these definitions, Hamaatsa's complaint presents an in rem proceeding regarding the road, in that the action pertains to the status of the road and seeks to declare the road to be public under state and federal law.  Although the action affects the interests, claims, titles, and rights of the Pueblo to the road and to restrict access to the use of the road, the essential character of the complaint is a declaratory action seeking a determination of the status of property as against the whole world.  The Pueblo's title to the road conveyed by the 2002 BLM quitclaim deed does not transform this action into an in personam action against the Pueblo. *See id.*  I acknowledge the Pueblo's argument that because the prayer for relief asked the district court to declare "that [the Pueblo] cannot restrict [Hamaatsa's] use of the . . . [r]oad as a member of the public," Hamaatsa is seeking to enjoin the Pueblo from restricting access to the road and that such an injunction requires in personam jurisdiction.  However, I do not read this language as seeking to enjoin the Pueblo from interfering with Hamaatsa's right to use the road.  Even if the complaint sought to enjoin the Pueblo and other members of the public, the character of the action is nonetheless in rem. *See United States v. Oregon*, 657 F.2d 1009, 1015-16 (9th Cir. 1981) ("[A] court possessed of the res in a proceeding *in rem* . . . may enjoin those who would interfere with that custody." (internal quotation marks and citation omitted)).

**{36}**     The Pueblo cites to a trilogy of New Mexico cases involving the declaration of the right of the plaintiff to use a road on allegedly privately owned adjacent land under § 932 for the proposition that such actions are in personam. *See generally Lovelace v. Hightower*, 50 N.M. 50, 168 P.2d 864 (1946); *Wilson v. Williams*, 43 N.M. 173, 87 P.2d 683 (1939); *Quintana v. Knowles*, 115 N.M. 360, 851 P.2d 482 (Ct. App. 1993).  The Pueblo argues that these cases do not contain "even the remotest suggestion that the exercise of jurisdiction by the [appellate courts] and the courts below was or could have been premised upon anything other than *in personam* jurisdiction."  However, likewise, none of these cases addressed or considered the issue of whether the jurisdiction was in rem or in personam. *Grygorwicz v.*

13

*Trujillo*, 2006-NMCA-089, ¶ 15, 140 N.M. 129, 140 P.3d 550 ("Cases are not authority for propositions not considered." (alteration, internal quotation marks, and citation omitted)).

**{37}** The Pueblo next argues that the complaint presents an action to quiet title under the quiet title statute, Section 42-6-1, and that "[t]he [d]istrict [c]ourt's decision . . . runs afoul of the longstanding legal principle in our [s]tate that actions to quiet title . . . are actions *in personam*." For support, the Pueblo cites *State ex rel. Truitt v. District Court of Ninth Judicial District*, 44 N.M. 16, 23, 96 P.2d 710, 714-15 (1939), in which our Supreme Court stated that "actions affecting title to property within the jurisdiction of the court, but which is not seized or otherwise brought under the direct control of the court for disposition . . . are usually held to be in personam. Such are actions . . . to quiet title to property." However, Hamaatsa's complaint is not an action for quiet title, nor are quiet title actions considered actions in personam under New Mexico law.

**{38}** In addition, in two later cases, our Supreme Court has limited the statement in *Truitt* that quiet title actions are in personam. In *Hill*, 79 N.M. at 34-35, 439 P.2d at 552-53, the Court noted that the facts of *Truitt* involved an attempted reformation of a sublease and that the Court addressed the issue of whether the plaintiff must personally serve the defendant in order for the district court to acquire jurisdiction. The Court stated that *Truitt* contained "various statements that were not necessary for that decision" and that "any discussion in the opinion of other types of action was dicta and will not be considered as binding upon us." *Hill*, 79 N.M. at 35, 439 P.2d at 553. In *Sullivan v. Albuquerque National Trust & Savings Bank of Albuquerque*, 51 N.M. 456, 462, 188 P.2d 169, 173 (1947), our Supreme Court also indicated that a complaint to quiet title is not an in personam action. Addressing whether "the plaintiff's [quiet title] complaint is accurately appraised as one in personam" so as to require personal service to the defendant, it concluded that "the complaint does have allegations sufficient to [be] treated as a complaint in a suit to quiet title to real estate" and that constructive service to the defendant was sufficient to withstand a motion to dismiss for lack of jurisdiction. *Id.* Implicit in this holding is the determination that a suit to quiet title is not an in personam proceeding and, instead, is an in rem proceeding.

**{39}** Further, a complaint in which a plaintiff seeks to establish and use a public road under Section 932 is not a quiet title action. In *Kinscherff v. United States*, 586 F.2d 159, 160-61 (10th Cir. 1978) (per curiam), the Tenth Circuit held that a suit by the plaintiffs under § 932 is not a quiet title action under the federal quiet title statute, 28 U.S.C. § 2409(a) (1948). The court reasoned that in order for a plaintiff to bring a quiet title suit, the plaintiff must have an interest in or title to the property at issue that is superior to the defendant's interest. *Kinscherff*, 586 F.2d at 160. The court held that the plaintiffs did not claim an interest or title to the road they sought to have declared public because a member of the public does not have a real property interest in public roads under New Mexico law. *Id*. at 161. Although the Pueblo attempts to distinguish *Kinscherff* on the ground that the Tenth Circuit addressed whether the complaint in *Kinscherff* was a quiet title suit under the federal quiet title statute, the New Mexico quiet title statute, Section 42-6-1, likewise requires that a plaintiff assert an "interest" in the property at issue. Therefore, Hamaatsa's complaint was

14

not a complaint seeking to quiet title in the road under Section 42-6-1.  Rather, Hamaatsa's complaint presented an in rem proceeding regarding the road.

**{40}**　I thus turn to whether the doctrine of sovereign immunity extends to in rem actions affecting property owned by a tribe in fee simple and whether tribal sovereign immunity applies to actions not seeking monetary relief.  In this regard, the Pueblo argues that, even if the complaint presented an in rem cause of action, the district court erred by determining that tribal sovereign immunity did not bar Hamaatsa's complaint.  It contends that the doctrine of tribal sovereign immunity applies to proceedings in rem when an Indian tribe owns the property that is subject to the proceeding and that the doctrine applies to proceedings not seeking monetary relief.

**In Rem Proceedings and Tribal Sovereign Immunity**

*Oneida I*

**{41}**　The Pueblo cites *Oneida Indian Nation of New York v. Madison County* (*Oneida I*), 401 F. Supp. 2d 219 (N.D.N.Y. 2005), *aff'd by* 605 F.3d 149 (2d Cir. 2010) (*Oneida II*), *vacated and remanded on other grounds by Madison County, New York v. Oneida Indian Nation of New York*, __ U.S. __, 131 S. Ct. 704 (2011) (per curiam), for the proposition that tribal sovereign immunity bars an in rem proceeding when an Indian tribe owns the property that is the subject of the proceeding.  In *Oneida I*, an Indian tribe filed an action to prevent a county from assessing and enforcing property taxes against tribally owned property. *Oneida I*, 401 F. Supp. 2d at 222.  After the United States Supreme Court, in a companion case, held that the county could lawfully impose a tax on the tribally owned property, the county filed a state court foreclosure action for unpaid taxes.  *Id.* at 223.  *See generally City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y. (Sherrill)*, 544 U.S. 197 (2005).  The tribe sought to enjoin the county in federal district court from proceeding with the state foreclosure action.  *Oneida I*, 401 F. Supp. 2d at 223.

**{42}**　Despite the Supreme Court's holding in *Sherrill* that a locality could impose a tax on tribally owned land, the federal district court held that tribal sovereign immunity barred the state foreclosure action against the tribally owned lands.  *Oneida I*, 401 F. Supp. 2d at 230. In so deciding, the district court stated that "[i]t is of no moment that the state foreclosure suit at issue here is *in rem* [and w]hat is relevant is that the [c]ounty is attempting to bring suit against the [tribe]."  *Id.* at 229.  The district court relied on the United States Supreme Court decision in *Kiowa Tribe*, 523 U.S. at 755, which, as I have discussed, declined to abrogate the tribal immunity doctrine and deferred to Congress to do so, and *United States v. Nordic Village, Inc.*, 503 U.S. 30, 38 (1992), which declined to adopt an "*in rem* exception to the sovereign-immunity bar" in the context of state sovereign immunity under the Eleventh Amendment.

**{43}**　The Second Circuit affirmed the district court's decision.  In affirming, the Second Circuit distinguished cases addressing whether a locality could impose taxes on tribal lands,

15

such as *Sherrill*, by noting that the freedom from state taxation derives from the tribal sovereign *authority* doctrine, not from the tribal sovereign *immunity* doctrine. *Oneida II*, 605 F.3d at 156-57. The Second Circuit noted that tribal sovereign authority and tribal sovereign immunity are two distinct doctrines with different historical origins and purposes. *Id.* at 157-58. In short, "*Sherrill* dealt with the right to demand compliance with state laws[, and i]t did not address the means available to enforce those laws." *Oneida II*, 605 F.3d at 159 (internal quotation marks and citations omitted).[5]

**{44}** I agree with the district court in *Oneida I* that the doctrine of sovereign tribal immunity applies to an in rem proceeding involving tribally owned property. Regardless of whether the complaint is characterized as in rem, an action essentially to declare a tribally owned property a public highway is in effect an action against the tribe. *See Oneida I*, 401 F. Supp. 2d at 229 ("The [c]ounty cannot circumvent [t]ribal sovereign immunity by characterizing the suit as *in rem*, when it is, in actuality, a suit to take the tribe's property."). Further, because tribal sovereign immunity is a matter of federal law and "Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests" in determining the bounds of the doctrine, courts exercise "caution . . . in this area." *Kiowa Tribe,* 523 U.S. at 759. If Congress wishes to authorize in rem suits against tribal property, it may do so. *See id.* ("Congress has occasionally authorized limited classes of suits against Indian tribes and has always been at liberty to dispense with such tribal immunity or to limit it." (internal quotation marks and citation omitted)).

*Armijo*

**{45}** This Court has previously applied the tribal sovereign immunity doctrine in a case involving similar facts. In *Armijo*, the tribe purchased a ranch outside the boundaries of the tribe's reservation. 2011-NMCA-006, ¶¶ 2, 11. The plaintiff filed suit against the tribe and another individual (the cross-claimant) for quiet title. *Id.* ¶ 3. The cross-claimant filed a cross-claim against the tribe to quiet title to a portion of the ranch based on adverse possession and the tribe moved to dismiss under Rule 1-012(B)(1) based on sovereign immunity. *Armijo*, 2011-NMCA-006, ¶¶ 4, 7. The district court denied the tribe's motion to dismiss because the matter arose outside of the tribe's reservation. *Id.* This Court

---

[5] Hamaatsa relies on footnote 7 in *Sherrill* to argue that *Sherrill* also addressed tribal sovereign immunity. Footnote 7 responds to an argument in Justice Stevens' dissent that the Court's analysis would lead to the inconsistent conclusion that the tribe could raise "tax immunity" as a defense to the eviction proceeding that the City of Sherrill had initiated in state court. *Sherrill*, 544 U.S. at 225 (Stevens, J., dissenting). The Court disagreed, stating in the footnote that "[t]he equitable cast of the relief sought remains the same whether asserted affirmatively or defensively." *Id.* at 214 n.7. I cannot conclude, however, based solely on this footnote discussing "tax immunity" that the *Sherrill* holding involves more than tribal sovereign authority as opposed to tribal sovereign immunity.

reversed the district court, applying tribal sovereign immunity and holding that doctrine applies "without drawing a distinction based on where the tribal activities occurred." *Id.* ¶ 12 (internal quotation marks and citation omitted). Although this Court recognized the district court's "concern with the equities of the case," it held that sovereign immunity is a jurisdictional question and not a discretionary doctrine. *Id.* ¶ 13. I acknowledge that *Armijo* does not address the specific issue before the Court in this case, whether tribal sovereign immunity applies to an in rem proceeding in which the subject matter is property owned by an Indian tribe in fee simple. However, the nature of the cause of action and the nature of the property subject to the suit are similar. In both cases, the effect of the suit is to deprive an Indian tribe of the use and control of property that the tribe purchased in fee simple. As we identified in *Armijo*, the proper inquiry is not the location or nature of the disputed property, nor the equities of the case, but whether a federal statute authorized the suit or the tribe consented to jurisdiction. *See id.* ¶ 14.

### *Yakima*

**{46}**     Hamaatsa argues that a determination that the tribal sovereign immunity doctrine applies to proceedings in rem conflicts with the United States Supreme Court decision in *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation* (*Yakima*), 502 U.S. 251 (1992). In *Yakima*, the Supreme Court addressed whether a county could impose an ad valorem tax on reservation land and an excise tax on sales of such land under the federal General Allotment Act. *Id.* at 253, 270. The Supreme Court held that the ad valorem tax "constitutes taxation of land within the meaning of the General Allotment Act and is therefore prima facie valid." *Id.* at 266 (alteration and internal quotation marks omitted). However, noting that an excise tax is in personam, not in rem, the Court held that the excise tax was void because it was not a tax on land within the meaning of the General Allotment Act. *Id.* at 265, 269-70. *Yakima*, like *Sherrill*, does not explore tribal sovereign immunity and instead deals with the inapposite issue of tribal sovereign authority regarding the extent the General Allotment Act permits a county to impose an ad valorem tax and excise tax on fee patented reservation lands. As in *Sherrill*, it was the tribe that instituted suit in *Yakima* for declaratory and injunctive relief, arguing that the taxes were invalid. *Yakima*, 502 U.S. at 256; *see Armijo*, 2011-NMCA-006, ¶ 18 (stating that cases involving a tribe bringing suit to preclude a municipality from imposing taxes or other local laws "do not explore the boundaries of a tribe's *sovereign immunity* from suit[, and r]ather, they explore a tribe's *sovereign authority* over purchased lands"). *Yakima* therefore does not support Hamaatsa's position that tribal sovereign immunity does not apply to an in rem proceeding.

### **Other State Cases**

**{47}**     Hamaatsa also directs us to several state appellate court decisions that have concluded that tribal sovereign immunity does not apply to an in rem proceeding concerning property held by an Indian tribe in fee simple. In *Anderson & Middleton Lumber Co. v. Quinault Indian Nation* (*Anderson*), 929 P.2d 379, 381 (Wash. 1996) (en banc), the plaintiff brought suit to partition and quiet title to an eighty-acre parcel of land located on a tribe's

reservation. The tribe filed a motion to dismiss for lack of jurisdiction based on tribal sovereign immunity, which the trial court denied, holding that it had in rem jurisdiction over the property. *Id.* The Washington Supreme Court affirmed, holding that under *Yakima*, "it is reasonable to conclude that the [trial court] had proper *in rem* jurisdiction over [the plaintiff's] suit to quiet title and partition" the property. *Anderson*, 929 P.2d at 385; *see also Smale v. Noretep*, 208 P.3d 1180, 1181 (Wash. Ct. App. 2009) (applying *Anderson* to deny tribal sovereignty in a case in which the plaintiffs sued to quiet title on tribally owned lands).

**{48}** In the same vein, in *Cass County Joint Water Resource District v. 1.43 Acres of Land in Highland Township* (*Cass County*), 2002 ND 83, ¶ 12, 643 N.W.2d 685, 691, the North Dakota Supreme Court addressed the "novel question [of] whether tribal sovereign immunity bars a purely in rem action against land held by [a t]ribe in fee." In that case, the court addressed a condemnation action, which was undisputedly an in rem proceeding. *Id.* ¶ 8. The court cited *Yakima* for the proposition that courts "have recognized distinctions in application of the doctrine of tribal sovereign immunity based upon the in rem or in personam nature of the proceedings." *Cass Cnty.*, 2002 ND 83, ¶ 13. Based on *Yakima* and *Anderson*, the court concluded that "the district court could validly exercise jurisdiction over [the] condemnation action" because it was a purely in rem proceeding. *Cass Cnty.*, 2002 ND 83, ¶ 20.

**{49}** I am not persuaded by the reasoning of *Anderson* and *Cass County*. As I have discussed, *Yakima* does not involve tribal sovereign immunity and does not compel the result reached in *Anderson* and *Cass County*. *See Oneida II*, 605 F.3d at 156-57 (stating that the freedom from state taxation derives from the tribal sovereign authority doctrine, not from the tribal sovereign immunity doctrine); *see also Armijo*, 2011-NMCA-006, ¶ 18 (recognizing the difference between tribal sovereign immunity and tribal sovereign authority). I also disagree with Hamaatsa's argument that *Sherrill,* 544 U.S. at 213, supports a conclusion that property held in fee simple is subject to local authority, including enforcement, because *Sherrill* likewise dealt with tribal sovereign authority, not tribal sovereign immunity. *See Oneida II*, 605 F.3d at 159 ("*Sherrill* dealt with the right to demand compliance with state laws[, and i]t did not address the means available to enforce those laws." (internal quotation marks and citations omitted)).

**Non-Monetary Relief and Tribal Sovereign Immunity**

**{50}** In denying the Pueblo's motion to dismiss, the district court also concluded that tribal sovereign immunity did not apply because Hamaatsa's complaint did not seek monetary damages. The Pueblo argues that the district court erred in determining that tribal sovereign immunity does not apply to a complaint for declaratory or injunctive relief.

**{51}** Generally, tribal sovereign immunity applies to actions for declaratory and injunctive relief to the same extent that it applies to an action for damages. *See Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271 (9th Cir. 1991) ("The immunity extends to suits for declaratory and injunctive relief."); *see also Wisconsin v. Ho-Chunk*

18

*Nation*, 512 F.3d 921, 928 (7th Cir. 2008) ("Tribal sovereign immunity is a necessary corollary to Indian sovereignty and self-governance[] and extends to suits for injunctive or declaratory relief." (internal quotation marks and citation omitted)); *Cohen's Handbook of Federal Indian Law* § 7.05[1][a] (Nell Jessup Newton ed., 2005) ("Tribal immunity applies to suits for . . . declaratory and injunctive relief."). Indeed, this Court has applied tribal sovereign immunity to a complaint that did not seek monetary damages. *See Armijo*, 2011-NMCA-006, ¶¶ 5, 24 (holding that tribal sovereign immunity applied to a cross-claim for adverse possession of tribally owned land).

**{52}**   Hamaatsa points out that the Fifth Circuit, in *TTEA v. Ysleta Del Sur Pueblo*, 181 F.3d 676, 680-81 (5th Cir. 1999), held that tribal sovereign immunity does not apply to actions seeking declaratory and injunctive relief. *See also Comstock Oil & Gas Inc. v. Ala. & Coushatta Indian Tribes of Tex.*, 261 F.3d 567, 571 (5th Cir. 2001) (following *TTEA*). In *TTEA*, the Fifth Circuit reasoned that the doctrine of tribal sovereign immunity should not extend further than the doctrine of state sovereign immunity and noted that "[s]tate sovereign immunity does not preclude declaratory or injunctive relief against state officials." *TTEA*, 181 F.3d at 680. It held that, regardless, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978), controlled the issue of declaratory and injunctive relief. *TTEA*, 181 F.3d at 180. In *Santa Clara Pueblo*, the Supreme Court concluded that tribal sovereign immunity barred a lawsuit against the tribe under Title I of the Indian Civil Rights Act, 25 U.S.C. §§ 1301-1303 (1968, as amended through 2010), but a tribal official was not protected by the tribe's immunity. *Santa Clara Pueblo*, 436 U.S. at 59. I thus cannot agree with the reasoning of *TTEA* that relies upon the absence of immunity, tribal or state, for officials because officials stand in a different position from the tribe or the state. Moreover, the Supreme Court has further clarified "that the immunity possessed by Indian tribes is not coextensive with that of the [s]tates." *Kiowa Tribe*, 523 U.S. at 755-56.

**{53}**   Rather, even though *Kiowa Tribe* involved a demand for monetary damages, its ruling nevertheless embraces non-monetary relief demanded of an Indian tribe. As I have discussed, the Supreme Court in *Kiowa Tribe* recognized that the original purpose of the tribal sovereign immunity doctrine may seem strained when applied to modern tribal business activity, off-reservation conduct. 523 U.S. at 757-58 (stating that the rationale supporting the tribal immunity doctrine "can be challenged as inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities"). I similarly recognize that the Pueblo's assertion of tribal sovereign immunity in this case appears to extend the doctrine beyond its original purpose of safeguarding tribal self-governance. In addition, this case involves the tribal acquisition of fee property rather than reservation land or land held in trust by the United States for a tribe. It thereby addresses tribal interests that are more attenuated than those addressed within the traditional reach of the sovereign immunity doctrine. *See id.* at 758. However, as I have earlier noted, despite its expressions of "reasons to doubt the wisdom of perpetuating the doctrine" of tribal sovereign immunity beyond the degree "needed to safeguard tribal self-governance[,]" the Supreme Court in *Kiowa Tribe* noted that "the doctrine of tribal immunity is settled law" and controlled in that case. *Id.* at 756, 758. It held that an Indian tribe is subject to suit only

19

where Congress has authorized the suit or the tribe has waived its immunity and deferred to Congress to make changes to the doctrine. *Id.* at 754, 758. I would not accept the invitation to add another exception. As in *Kiowa Tribe*, Hamaatsa's remedy lies with Congress to change the law concerning the doctrine. *See id.* at 754.

**Hamaatsa's Remaining Arguments**

**{54}** Hamaatsa argues that we should affirm the district court because "the Pueblo's position would deprive Hamaatsa of a judicial forum." Hamaatsa cites *Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes* (*Dry Creek*), 623 F.2d 682, 684-85 (10th Cir. 1980), in which the Tenth Circuit concluded that tribal sovereign immunity did not apply to a suit by non-Indian plaintiffs against a tribe under the Indian Civil Rights Act when the tribal court did not provide a forum to hear the dispute. However, the Tenth Circuit has limited the *Dry Creek* exception to suits "against an Indian tribe under [the Indian Civil Rights Act] when three circumstances are present: (1) the dispute involves a non-Indian; (2) the dispute does not involve internal tribal affairs; and (3) there is no tribal forum to hear the dispute." *Walton v. Tesuque Pueblo*, 443 F.3d 1274, 1278 (10th Cir. 2006). Further, the Tenth Circuit has stated "that the rule has minimal precedential value and in the twenty-six years since *Dry Creek*, with the exception of *Dry Creek* itself, we have never found the rule to apply." *Walton*, 443 F.3d at 1278 (internal quotation marks and citation omitted). Because Hamaatsa's complaint does not arise under the Indian Civil Rights Act, the *Dry Creek* exception does not apply in this case.

**{55}** Hamaatsa also argues that the district court's order should be affirmed because "tribal sovereign immunity should not apply more expansively to tribes than to other sovereigns." However, Hamaatsa fails to develop this argument on appeal, and I therefore do not address it. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (refusing to review an undeveloped and unclear argument on appeal).

**CONCLUSION**

**{56}** For the foregoing reasons, I respectfully dissent from the Majority Opinion. I believe that the district court should have granted the motion to dismiss.

_____
**JAMES J. WECHSLER, Judge**

**Topic Index for *Hamaatsa, Inc. v. Pueblo of San Felipe*, No. 31,297**

**Appeal and Error**
Interlocutory Appeal

**FEDERAL LAW**
Federal Jurisdiction

20

**GOVERNMENT**
Highways
Sovereign Immunity

**INDIAN LAW**
Indian Lands
Indian Law, General
Tribal and State Authority and Jurisdiction

**JUDGMENT**
Declaratory Judgment

**JURISDICTION**
Federal Jurisdiction
In Rem
Personal
Subject Matter